Judge Mills, are you on the phone? I certainly am, Judge. Wow, you're coming through loud and clear. I hope you can hear us as well. Very, very nicely. Thank you. Okay, excellent. We are here for a special sitting upon the return of this case to the court. The combined were two cases, Grace Tan Go and Roderick Lim Go v. Holder. And with that, Petitioners' Council may begin. May it please the Court, my name is Stacey Tolchin and I represent both petitioners in this case. I'm going to pull that microphone a little closer to you. Yes, Your Honor. Is that better? That's great. That's good. Thank you. I would like to reserve three minutes of my time for rebuttal. The central issue in these cases is what is the proper standard for a motion to reopen before the Board for purposes of the Torture Convention? Specifically, what regulation do you think applies in this situation? Your Honor, I don't believe there is one. I don't believe that the agency followed the mandate of FARA and enacted a regulation for the Board for reopening for CAT. The regulation that is cited by the agency is 1003.2c. That is a 1997 regulation that was promulgated prior to FARA's 1998 enactment, and it only references asylum and withholding of deportation. It doesn't reference CAT. Okay. So you're not taking the position that it should be extended to cover CAT claims. You're saying it doesn't cover them. Is that your position? My position is it doesn't cover, but in addition, if it did, it would be ultra-virus to the statute. Because I don't believe FARA allows for an exception for only allowing reopening where there is a change in circumstances arising in the country of nationality. FARA applies without exception. It protects individuals from involuntary removal where there are substantial grounds to believe that they are subject to torture. It doesn't matter geographically where new evidence comes up. If an individual is in the United States and becomes a political activist, then they're protected after a removal order. They're protected under CAT, and that's actually supported in the Edu v. Holder decision. So is it your position that because of the statute, there can be no procedural requirements or limitations on motions to reopen? I think there can be time limitations. I think that Chen, Your Honor, you're familiar with, obviously, and then FARA-GLOW from the First Circuit say, sure, it's fine to set numerical limitations, provide notice, and allow people a reasonable time to submit a motion to reopen. But as far as a geographical limitation, that's the problem with the statute. FARA applies without exception. And it's similar to the Court's cases in Coit and Reyes-Torres, where there the Court looked at a statutory right to a motion to reopen from IRA-IRA, the statute at 1229AC7C, and said Congress created a right. The agency can't limit that right to a motion to reopen based on the applicant's departure from the United States. And for that reason, the Court said the departure bar regulation was invalid. It's the same reasoning here. Congress provides without exception that we protect people from involuntary removal where there are substantial grounds to believe they're subject to torture. So there has to be a means of obtaining review when there's new evidence. I'm sorry. Go ahead, Judge. I was going to say, what do you do with the Chen case? Doesn't this appear to be a reasonable procedural requirement? It doesn't, Your Honor, because Chen cites FARA-GLOW, and FARA-GLOW, again, is about the time limitation. Right? And I, you know, the time limitation is fine where there's notice and a reasonable time. This is a geographic distinction. Chen primarily addresses, of course, asylum and withholding of removal. And the analysis in Chen is based on the statute at 1229AC7C. That's IRA-IRA statute for asylum and withholding of removal. Change country conditions requirement there, of course, is fine. Congress was clear. But that statute was enacted in 1996. FARA was enacted in 1998. FARA doesn't reference the statute. FARA says unequivocally, we don't remove people involuntarily if they're going to be subjected to torture. Under your theory, what is the limitation? I think it's reasonable for the agency to promulgate a regulation saying, for instance, within the motion to reopen. What is the limitation here in this case? I don't believe the agency promulgated a regulation that was considered by FARA. What is the limitation here in this case? The geographic limitation? The limitation to file. The limitation to file here. There isn't one because the standard isn't there. It can be years. It can be centuries. I think it's up to the agency. I think an obvious. Have a reasonable limitation. I think an obvious. That's what Chen says. Correct, but on time. On time, not on geography. Chen talks about asylum and withholding reading the clear language of the statute. Congress was clear for purposes of asylum. I don't understand your argument in the following sense. Let's take an example in which a petitioner makes a CAT claim, and it's adjudicated on the merits, and it's in country XYZ, and all through the process it's found that there is no probability or possibility of torture that's sufficient, and therefore the CAT claim is denied. Why isn't it reasonable to require changed country conditions? Because if everything is exactly the same, all you're doing is relitigating the same claim again that's already been litigated. I think it depends on a case-specific situation. If the person after their removal order becomes a political activist and based on their activism now is at risk of torture by going home, that's a case that CAT would contemplate, and that's the sort of thing that's discussed in Edu v. Holder. So it doesn't matter where the change arises. There has to be a change for a motion to reopen, no question, new evidence. So you're saying that change occurs in 5 years or 10 years. Do they have to file a new CAT claim, or can they rely on the one that's 5 or 10 years dismissed? And there's a final order of removal, Your Honor? Yes. Then I think they do have to reopen. Now, I think it's up to the agency to say you have to file to reopen within 90 days of any change. But let's say, I mean, in this case, the GOs weren't. I'm missing something here. Is there anything to prevent your client from filing again now a new CAT claim? Yes. You have to do a motion to reopen. That's the Huang case, H-U-A-N-G, in order. And if successful, they can get a new claim. If the motion to reopen is granted, then they can go before the judge, right. That's a reasonable procedural process. Right. But the question is if the motion to reopen is filed after 90 days from the board decision. Right? So if the person, as in this case, the GOs were filing the direct appeal, they weren't absconding. They were litigating their claim before this Court. Their motion to reopen based on new evidence is filed more than 90 days after the board decision. But the board's position is you can't reopen because you have to show a change in circumstances arising in the country of nationality or country conditions. Right. And the board is unclear, by the way, because the board cites a regulation that states one standard, but then says the standard is a change in country conditions. These are two different standards. One comes from a regulation. One comes from a statute. And the statute applies only to asylum and withholding, and the regulation applies only to asylum and withholding. Let me ask you this. There is the board has the authority, sua sponte, to reopen, which is a method of fulfilling the statutory requirement that you've cited. If the personal circumstances have changed such that a person who was not previously of interest to the government or others in whatever the country is now is going to be subjected to torture, why isn't that a sufficient process to deal with the problem that you raise statutorily so that you're not left someone in your client's position is not left without a remedy? Okay. Your Honor, do I mind if I go ahead and answer that? Please do. We may take you over your time. Thank you. The sua sponte regulation allows the board certainly to grant if there's at any time based on new evidence. It also allows the board to deny on discretionary grounds. The regulation says explicitly that the board may deny even if there's new evidence and a prima facie claim. The problem with that is CAT is nondiscretionary. It's mandatory. And as Justice Scalia stated in the concurrence in INS v. Doherty, if a form of relief is nondiscretionary and the first two elements, new evidence and prima facie claim, are established, reopening is required. And so if the sua sponte regulation allows for a discretionary denial, that's inconsistent with CAT. Here we don't know because they don't really address sua sponte reopening. I want to ask you a question about the merits, assuming that we could ever get there. I have difficulty seeing why the new evidence, even if we can get there, shows in any way that I can't pronounce this gentleman's name. I'm sorry. Tadjan Langit. I don't know how to pronounce it. That his testimony was incorrect or contradicted because he testified very narrowly it seems to me that he personally, while he was working in Cebu, did not see a complaint about torture. And there's nothing in any of the materials that you have presented that directly contradicts that. There are things that suggest that maybe he's not generally a nice or trustworthy guy. But I didn't see anything that specifically shows that he, in fact, did seek such complaints at the time he was there, which was his testimony that he didn't see anything. Right, Your Honor. So he testifies, this is page 42 of the transcript since there's three different records. He says, as far as the province and the city of Cebu is concerned, I am categorical that there is no incident of torture in the jails there. The evidence that was submitted in the record documents the use of torture in Cebu. The most compelling is from 2009 in pages 178 to 181 of Roderick Goh's record. There is a human rights worker named Patriarca who, while he was detained pending prosecution, was tortured subject to the water cure, made to wear a diaper wrapped in duct tape, kicked and punched. He presented this to the court. He had the legal means of challenging his case, just like the Gohs do. He had access to the media as a human rights worker. And nevertheless, this goes on. There's also other documents in the record that really do discuss that torture exists in Cebu. So this contradicts the categorical assertion from Tangelangit. And it's very similar to what happened with Esmeralda, who was the first government witness. That witness had said categorically there's no use of torture in the Philippines. And, of course, the board said, we know that's not true. We see the country conditions. And they remanded the case back to the judge, finding that he could not be relied upon. And Judge Osuna in the second board decision says, I don't believe that Tangelangit is correct because we can't believe his assertions. We know about corruption. We know about the pervasive use of torture. And nevertheless, of course, the two judges found that there was no claim to the torture convention. This new evidence contradicts Tangelangit's statements. And that's why it's material and goes to the heart of whether there's a prima facie claim to CAT. Shall I stop? I'm almost two minutes over. What about this evidence that he had a client who was disgruntled or something like that? What's that have to do with anything? Right. There's two pieces of evidence in there, one about a complaint from a client and one about him not appearing for court and then having a warrant out. They go to whether or not he was a credible witness and they go to the issues of corruption. I don't know that standing on their own ---- Wait a minute. Wait a minute. Are you telling me that that goes to corruption if you don't make appearances? And it's certainly not. It's not enough. I understand that. But certainly in Roderick Goh's case, you combine that with overwhelming documentation on corruption with ---- Well, then don't combine it with it if it isn't very material. What is the overwhelming evidence that we know that there is some torture that goes on, but the finding was that because of Mr. Goh's position, they wouldn't torture him because it would ---- he's nationally known and they would not torture him under those circumstances. That was the holding. Right. And there's about six reasons why the Court goes into why ---- Give me your best one. No, no, no. Why the Court found that. But I think that most of it was based on Tanja Longin's assurances, his categorical assertion that there's no use of torture in Cebu. The Court said, well, these folks will have access to the media. This is a high-profile case. Well, the same is true for Mr. Patriarca, who was the human rights worker from 2009. Human rights workers are all over the Philippines, but Mr. Goh, if I understand it, is a very, very important political and prominent figure. Are you saying it's exactly the same? No, nothing is exactly the same. But I think it's relevant, and I think the most important thing is what standard was applied by the Board here. Again, the Board says you didn't show changed country conditions. What we're saying is that's not the right standard. The question is, was the new evidence material to the claim to establish prima facie eligibility for cash? When did this happen to the human rights worker? 2009, Your Honor. He was available before? I'm sorry. I don't know, Your Honor. He ---- no, no, no. Available before?  The last order from the Immigration Court is in 2005. So it is new evidence. Thank you. Thank you. We'll give you back some rebuttal time because we've used a lot of it for questions, and we'll hear from the government. May it please the Court, Matthew George for the Attorney General. I apologize for any blinking I may do. I have an issue with my eye, so please excuse that. Not a problem. As Petitioner's Counsel has just pointed out, this Court in its prior decision pointed to six different things that supported a finding that it was not more likely than not that the GOs would be tortured if returned to the Philippines. They've now presented some evidence undermining the witness's testimony, Mr. Tejan Langit, and cumulative evidence that they say supports a finding that torture generally occurs in the country. This evidence is not qualitatively different or material as the Board found from what they previously presented. The country evidence is redundant and lacks materiality. As the Court stated in Najambandi, it recounts generalized conditions and lacks individualized relevancy. As the Court has already pointed to, some of the factors that it previously cited in its prior decision in this case was the prominence of the GOs within the country and their affluence. The first is the notoriety of this particular case. What about the human rights worker evidence? That's just more generalized evidence. Just because there's one, perhaps, incidence of torture of one individual does not show that it's more likely than not. Do we know anything about him and whether or not the press picked it up or et cetera? Is it just – is that the only thing there is in the record? That's the only thing really I saw in the record, Your Honor. I'm not sure how notable that case is, how prominent, whether it's featured in the media and those sorts of things. Why isn't it important that one of the key witnesses was undermined?  It's possible his credibility or persuasiveness could be questioned. However, the specific evidence that Petitioners have provided doesn't go towards his personal knowledge of factors associated with torture  at the time he was there in the Philippines and his general knowledge and his general credibility regarding torture. They go to, it seemed like, his practice of law after the fact in the Philippines, one incident having to do with a disgruntled client where there's a bar complaint that the court ultimately resolved the claim in favor of the witness. And then, let's see, a newspaper article about a bounced check where the client was later paid in cash. And so perhaps the witness is not a good accountant or not a good money manager, but that has absolutely no bearing on his personal knowledge of country conditions at the time that he testified. What is your view of what regulation, if any, covers the situation of moving to reopen a cat claim? Our position would be that the regulation, as the Board cited here, 1003.2C32 is the proper regulation. How is that possible? By its terms, it applies only to asylum and withholding of deportation. It actually says, yeah, withholding of deportation. As you correctly pointed out, Your Honor, it actually doesn't. That form of relief no longer exists. But how the Board has interpreted that regulation is to read into it an additional exception or inclusion for cat claims, as it has done in this case. And that's a perfectly reasonable interpretation of this regulation. The alternative is there's simply no way to reopen an untimely cat claim, either under the motion to reopen statute or under this particular regulation. Well, sure, there's a sua sponte reopening is available in any kind of claim, at least as I read it. Yes, that would be available. But, again, that would be a broader exercise of discretion, because the Board then would have the ability, even if a prima facie case was made out, not to reopen. What's our test of the Board's ability to extend a regulation to an area that is not covered prior to that time? It would be whether that extension is a reasonable interpretation of the regulation, essentially a Chevron deference type, perhaps because this difference. Would it be our deference, but A-U-E-R, rather than Chevron? Because the question you're asking us to answer is whether the Board's interpretation of its own regulation is to be a court of deference, not whether it's interpreting a statute. Chevron is about an agency interpreting a statute, and A-U-E-R is about an agency interpreting its own rule, I think. So what are the factors that, what makes it reasonable to say that a regulation saying to apply or reapply for asylum or withholding also applies to cat claims? Well, it's reasonable because if the Board applies the statute, the motion to reopen statute itself strictly and this regulation strictly, there simply is no means to reopen an untimely cat motion to reopen, or I phrased that poorly, to grant an untimely motion to reopen seeking cat claims. Well, there's, in addition to the sua sponte reopening, there's also subsection, I think it's little III, little three, where the parties agree. So, you know, one has to rely perhaps on the good faith here, but if someone fit the description that opposing counsel was saying, you know, it's clear that people are tortured in country X, but previously this person wouldn't have been tortured because they had never done anything. And now they are suddenly an important activist. So it's personal circumstance that's changed. Would that reopening by agreement be available as well? Yes, Your Honor. I hadn't really, I guess I suppose, considered those alternative ways of reopening. They could go to ICE and seek a joint motion to reopen, which would be allowed under the statute and the regulations, as well as could appeal to the board's sua sponte authority, as the Court has mentioned. So there are alternatives there. I guess they aren't as explicit as reading this sort of exception into. Well, they're less explicit in one way, but more broad in another, because as you point out, the one that you're relying on requires changed country conditions and would not allow personal conditions, personal situation to play a role. The other forms are less specific to cat claims, but would allow personal circumstances to come into the mix as well. Yes, Your Honor. And I point out just in terms of the mandatory nature, withholding of removal under the Immigration Nationality Act under Section 1231 is also a mandatory form of relief, but it's also explicitly subject to these changed country conditions requirements. And I think courts almost nationwide have held that changed personal circumstances do not meet that standard. And so the mandatory nature, to whatever extent that's applicable to cat as well, has a counterpart in withholding of removal under the INA. And sort of along those lines, FARA itself is really two sections. Subsection A is a policy statement, a very general policy statement about not returning people to places where they will be tortured. And Subsection B is just a direction to the agencies to implement regulations. And so there's nothing in FARA that speaks to motions to reopen that speaks to untimely motions to reopen. However, we do have a statute and a regulation addressing motions to reopen and addressing untimely motions to reopen.  motions to reopen. Roberts. Is the government anxious to have us decide this issue so it can go ahead? I mean, one possibility is that we could look, skip it and say it's not worth we shouldn't get into it because it doesn't make any difference because the evidence isn't there and there's no abuse of discretion in the way they handled it. On the other hand, I suspect this is not virgin territory, that there's been other claims involved in this because the statute not being changed to embrace cat. It strikes me as that the board is trying to be charitable to establish some rules that people can abide by, but we don't necessarily have to get it. Well, let's position the government. Do you want a ruling on this or is it? No, Your Honor. Our position is the evidence in this case does not meet any standard, and therefore because that we really don't need to reach the question of what regulation applies. We would prefer to wait to another day to really resolve that question. There may be a statutory change or something else, or a regulatory change. Yes, Your Honor. I see I'm out of time. May I make one more point? Please. I just again cite to the unpublished decisions that I cited in my 28J letter where the Court has simply essentially said that the regulation applies, 1003.2c32, and mentioned that the Petitioners in those cases did not show change of country conditions, and I think the same result should apply here. Thank you. Thank you, counsel. Ms. Tolchin, we used all your time, but please, if you'd like to argue in rebuttal, we'll give you a couple of minutes to do that. Okay. Just briefly, the first issue goes to the level of deference. There is a regulation that's cited by the Board that existed prior to FARA. FARA instructed the agencies to promulgate regulations that were consistent with CAT in 1998, and the agency promulgated regulations in 1999, but never addressed this issue of reopening before the Board. Further, while Respondent is stating that the agency has interpreted the regulation to apply for CAT, there is no published decision on this, right? All we see is an unpublished decision and assumptions made by the Board that it applies to CAT without any reasoning. So to the extent that Chevron would apply, I would first say I think FARA is clear that there are no exceptions to the policy that's stated in FARA, but even going to Steps 2 of Chevron, we would see that there is no published decision, and so we're looking at our Strickland deference, which looks at whether the reasoning is persuasive from the agency. But the agency hasn't been thorough in its analysis. It doesn't tell us why does it think that the regulation citing only to asylum and withholding and restricting a motion to reopen based on geographics, why does that apply to CAT? And so there really should be no level of deference that's applied to the Board. I also wanted to address the issue of joint reopening. It's discretionary. When you go to the Office of Chief Counsel to request that they join in a motion to reopen, it's discretionary on their part. And then we get to the problem that withholding, sorry, that CAT is nondiscretionary. It's a mandatory form of relief. It's a mandatory form of relief only if there are facts to support it. So, for example, let's, I'm not saying this is your position, your situation, but let's say someone comes and says, well, I have changed conditions because I've now dyed my hair, and therefore I want to reopen. It's not mandatory to give CAT relief. It's not. So shouldn't there be some screen permitted as to when even a CAT claim can be reopened? 100 percent, but that screener should be the Board rather than the Office of Chief Counsel, because obviously they act as the prosecutors in these cases, and so they have an interest of trying to support individuals. Then under the joint motion to reopen example, they would be the ones that decide whether or not you get a form to reopen. But not under sua sponte. That's the Board's bailiwick. So if they see the I've dyed my hair case versus the I'm about to be killed case, they have the opportunity to make a distinction. And I think that's appropriate. Again, the only problem is allowing the discretionary denial, but that may be something to save for another day. I last just wanted to bring up the evidence. I think the Court first needs to look at what standard was applied by the Board when they denied the motion to reopen. The Board says over and over petitioners did not demonstrate changed country conditions. And so the threshold issue really is what standard was applied by the Board and was that the proper standard? I wanted to direct the Court to Judge Osuna's dissent in the 2006 Board decision at page 6 of the record, because he goes through and says we shouldn't have believed Tanjalanji because basically his testimony is the same as Esmeralda, and we can't trust these witnesses because they're unequivocally stating that there is no torture. I think that the new evidence that was submitted goes to directly to Mr. Osuna's dissent and really does materially address petitioner's eligibility. How does it go directly to his dissent? He was just complaining about the evidence. I don't understand your position. We look at the facts that are determined by the Board and we treat them for an abuse of discretion. That's the standard. He's looking at the testimony and say, he says, I don't believe the testimony. My dissents, I've never changed my mind, but the Board has found it otherwise and we have to follow that. But I don't get the position that now all of a sudden this evidence makes the dissent more important than what the Board has said. I think it goes to whether or not Mr. Tanjalanji was a credible witness and whether you know, again, he makes these categorical assertions and that's the same reason why they find that the Board remanded the case because of Esmeralda's testimony. It's the same rationale. Esmeralda said there is no torture in the Philippines. The Board said, look, we know that's not true. We can't rely on his testimony. They send it back down. Thank you, counsel. Thank you. We appreciate the arguments of both counsel and the case is submitted. We will adjourn for this special sitting.
judges: Mills, Wallace, Graber